LEWIS *v*. DETROIT VITRIFIED BRICK CO.

1. MASTER AND SERVANT—INDEPENDENT CONTRACTOR—MINES AND MINING—COMPENSATION.

A laborer working in a mine, subject to discharge at any time by the proprietor, receiving payment for removing shale and rock, by the ton, fixing his own hours of labor, and providing certain of the tools and materials for carrying on the work, is a servant, not an independent contractor.[1]

---

[1] As to who is deemed to be an independent contractor, see note in 65 L. R. A. 447.

2. MINES AND MINING—EVIDENCE—JUDICIAL NOTICE.
   The court cannot take judicial notice that general inspection of a mine is necessary.

3. SAME—SAFE PLACE—SUPPORTING AND TIMBERING DRIFTS.
   It was a question for the jury whether defendant used reasonable care in providing its miners with a safe place to work, where it appeared that the operations were carried on in an old coal mine, from which the timbering was removed as operations advanced; that blasting was being done in the part of the mine in which plaintiff worked; that the mining boss knew certain rock and material in the roof were loose and liable to be jarred down, but had taken no precautions to prevent it, and that the materials fell and injured plaintiff while he was working in a part of the mine that was used as a permanent passageway.

4. SAME.
   Whether ordinary care required that the rock be removed or supported in its place, whether the alleged negligence was attributable to defendant, and whether plaintiff was negligent, were questions of fact.

5. SAME—EVIDENCE—ASSURANCE AS TO SAFETY.
   While evidence that the agent of defendant advised plaintiff, when he went to work, that the mine was a safe one, and that plaintiff had had no previous experience in a mine, was incompetent to prove the defendant's negligence, its admission did not prejudice defendant, since the only question of want of safety, under pleadings and evidence, related to the overhanging loose rock, and since plaintiff's inexperience was only in question as affecting his contributory negligence.

6. SAME—INSTRUCTIONS—CONTRIBUTORY NEGLIGENCE.
   In the absence of testimony tending to show that the mine boss was accustomed to examine the roof of the drift after each blast, except in the immediate vicinity of the explosion, defendant could not complain of the court's instructions to the jury that if plaintiff followed the mine boss into the drift before the latter had time to make such examination, he was guilty of contributory negligence, the plaintiff receiving his injuries at some distance from the usual point of inspection.

7. DAMAGES — CHARGE OF COURT — GENERAL INSTRUCTIONS — SAVING QUESTIONS FOR REVIEW.
   That instructions to the jury on the question of damages were of a general character, does not require the reversal of the case, if they were correct and no requests for more specific instructions were presented.

Error to Shiawassee; Miner, J. Submitted January 5, 1911. (Docket No. 25.) Decided February 1, 1911.

Case by William Lewis against the Detroit Vitrified Brick Company for personal injuries. Judgment for plaintiff; defendant brings error. Affirmed.

*Odell Chapman*, for appellant.

*George E. Pardee* and *A. L. Chandler*, for appellee.

OSTRANDER, C. J. No testimony was introduced on the part of defendant. It is certified that the record contains the substance of all the testimony given upon the trial. In neither brief is there a statement of what the testimony for the plaintiff tends to prove. From such statements as the briefs contain, and from the record, we learn that the testimony for the plaintiff tends to prove that a part of the business of defendant is the mining of shale, or clay. The property in which the deposit of shale is found was formerly operated as a coal mine. The deposit of shale is upon a lower level than the deposit of coal. The shaft of the mine is some 50 feet in depth, ending in an entry or gallery some hundred feet or more in length, which runs north and south. On the west side of this gallery, drifts have been run into the shale, which is removed by first drilling into the face of the deposit, exploding dynamite, and, as the shale is torn down by the force of the explosion, and by picks and shovels, it is loaded in cars running upon tracks, pushed out to the main gallery, and hoisted to the surface. The drift in which plaintiff received his injury is about 12 feet wide, the deposit of shale about 17 feet in depth, and directly over the drift is a tunnel made in earlier days in pursuing a seam of coal, so that the roof of the drift is 21 or 22 feet above the bottom of the drift, and is in fact the roof of the tunnel made when the coal was taken out. In the operations in this drift, the shale was removed at the rate of about a foot a day. In the mining of coal, the roof of the

mine or tunnel had been to some extent braced or propped. In drifting into the shale, when these props were reached, they were taken out and either thrown to one side or used to make ties upon which to lay the rails for the tram cars. The shale mine itself was an untimbered mine.

The plaintiff, a man about 38 years of age, who had no experience in mining, applied at Flint to a Mr. Cook to obtain employment in the mine. Later, plaintiff was taken by Cook, or went with Cook, to the mine, and was there introduced to Mr. Peake, the mine boss, with the statement that he (Cook) had charge of things above ground and Peake had charge of things below ground. In the conversation it was stated there was employment for plaintiff at $2.50 a day or 30 cents a ton, and Peake, with the plaintiff and another, went down into the mine. The mine was wet, and wholly unlighted except by the oil lamps which the miners carried on their caps. Just what plaintiff was able to see upon this visit, or what investigation, if any, he made, is not very clear. Later, he went to work, at first at shoveling under the direction of the mine boss, and was afterwards given a place in the drift which has been described, and where he understood that he was working by the ton and not by the day. There were two other men at work in this drift, one of whom drilled, and the others, including plaintiff, loaded the shale and pushed the car out and in. The explosive was handled by Peake and each shot was fired by him. Plaintiff knew the character of dynamite and the effect produced by exploding it. When a shot was ready to be fired, the men left the mine, descending again after the explosion, when it was the practice for Peake to go ahead into the drift and make some examination of the condition of the walls and roof to see whether they were safe. Plaintiff had worked one day in this drift and had begun work the second day, which was July 14, 1908. He had gone to the surface with the others, a shot had been exploded, and he, with Peake and his companions, had again gone down into the mine. Peake was up on the breast of the drift making

some examination. Plaintiff and one other were some 20 or 30 feet back from the end of the drift, loading a car, when a rock weighing a ton or more fell from the roof of the old mine, smashing the car, pinned plaintiff to the bottom of the drift, and badly injured him. His companion was also struck, but managed to avoid being crushed. Plaintiff also introduced testimony tending to show that he was assured by Peake before beginning work that the mine was a safe mine; that the rock which fell upon him was loose and was known to be loose by Peake and by others; that the attention of Peake had been directed to it by some of the men who had worked in the drift before plaintiff worked there; that in the coal mine this rock had been supported by props which had been removed; that when plaintiff began work in this drift it had been carried to a point considerably beyond that in which the rock overhung the drift; that he had no notice or knowledge of the condition of the roof, and that with the lights that were carried and with his experience it is improbable that he would have discovered or could have understood there was danger to be apprehended from the falling of this rock. The testimony with respect to the assurance that the mine was a safe mine was later stricken out.

The declaration of the plaintiff contains two counts. In the first count is alleged by way of inducement the ownership and operation of the mine; that explosives were used; that plaintiff was at work under the direction and charge of defendant through its boss or foreman; that the walls of the mine were not timbered, braced up, or supported in any way. The duty of defendant and the breaches thereof which are alleged are:

"Whereby it became and was the duty of said defendant to put in braces, timbers and supports in said roof, drifts, stopes, crosscuts and chambers of said mine, and to provide proper and suitable timbers and material to prop and support the overhanging walls of said mine, good and proper means to prevent the walls and the clay and rock

therein from crumbling, caving and falling down on the plaintiff and the servants of defendant, and to duly and properly inspect said mine whereby it might be kept safe; and to furnish plaintiff with a suitable and reasonably safe place in which to perform his work as aforesaid, and not to put him in a place unsafe or surrounded with dangers and perils not fully known and understood and not assumed by the plaintiff.   Yet the defendant disregarding its duty as aforesaid, to wit, July 14, 1908, and while plaintiff was so engaged in his regular employment as aforesaid, and not knowing of any unreasonable or extrahazardous danger surrounding him, the said defendant wrongfully and negligently neglected and refused to duly and properly inspect said mine, whereby it might be kept reasonably safe for plaintiff to work, and neglected and refused to provide a reasonably safe place in which plaintiff was required to perform his work as aforesaid, by then and there neglecting and refusing to place timbers and supports in said roof, drifts, stopes, crosscuts and chambers of said mine, and to provide proper and suitable timbers and material to prop and support the overhanging walls of said mine, good and proper means to prevent the walls and the rock and clay therein from crumbling, caving and falling down on the plaintiff and injuring him, said plaintiff, and did consign plaintiff to a place not reasonably safe, and which was surrounded with dangers and perils not fully known and understood by plaintiff, and therefore not assumed by plaintiff; and that, therefore, the requiring plaintiff to perform as aforesaid was actionable and tortious wrong and negligence of said defendant toward said plaintiff."

In the second count the employment of the plaintiff is alleged; his inexperience in mining; the fact that he did not understand the situation; that he had no adequate knowledge or conception of the dangers of mining; that defendant informed him that the place was safe; and that there was no danger to the plaintiff.   The duty alleged and the breaches are:

"Whereby it became and was the duty of said defendant to provide proper and suitable timbers and material to prop and support the overhanging walls of said mine, and also inasmuch as plaintiff was inexperienced in such work and did not know of or comprehend the dangers and

perils surrounding him in said work and the said dangers not being obvious to him and not assumed by him, and furthermore inasmuch as the defendant informed plaintiff that there was no danger and that the place was a safe place to work—to fully and sufficiently warn and inform plaintiff of the surrounding dangers, viz., that said walls, drifts, etc., not being braced, supported or propped, that the overhanging walls and other walls were liable to cave, crumble and fall upon and against the plaintiff, injuring him, and that defendant knew or should have known of such dangers and surroundings. Yet said defendant disregarding its duty, as aforesaid, on, to wit, July 14, 1908, neglected to provide proper and suitable timbers and material to prop and support the overhanging walls of said mine, and while plaintiff was engaged in his regular employment as aforesaid, and not knowing of any unreasonable or extrahazardous danger surrounding him, the said defendant wrongfully and negligently refused and neglected to warn and inform plaintiff that the place he was consigned to work was not a reasonably safe place for want of braces, props and supports in the drifts, stopes, chambers, walls, etc., of said mine, but that said defendant on, to wit, a week before wrongfully and tortiously informed plaintiff that the said place was safe and all right in which to perform his said work, and that, therefore, the requiring of plaintiff to perform under the circumstances aforesaid was actionable wrong and negligence of said defendant toward said plaintiff."

As the case for the plaintiff was developed, three principal propositions, based upon the testimony for the plaintiff, were, and are now, asserted by defendant as established and as preventing a recovery by the plaintiff. They are, *first*, that the plaintiff was an independent contractor; *second*, that the point in the mine at which plaintiff received his injury was within the area disturbed by the mining operations as they were carried on there, and constantly changing or liable to change; *third*, that Peake was a fellow-servant of plaintiff.

The testimony relied upon to support the first proposition may be said to be undisputed, the effect of it, as defendant contends, being that plaintiff and the men with whom he was working were not under the control of

defendant or its agents with respect either to the manner of doing the work or the results to be obtained. The question was left to the jury, but we are of opinion that the court might properly have instructed the jury that plaintiff was not an independent contractor. It is true the men were to be paid 30 cents a ton for the shale mined by them, to be divided between them, excluding Peake. Their hours for labor were fixed by themselves, unless— and upon this subject we find no testimony—power controlled by defendant was used to hoist loaded cars, in which case it would seem they would be required to adapt their hours of labor to the hours of hoisting. They furnished lights and explosives, or the cost of them, and were generally masters of their time and of the efforts they should make. But as against these facts are those now to be stated: The mine belonged to defendant, which furnished cars, track, and the place to work. An agent of defendant handled and exploded the dynamite. Control of the interior of the mine was with defendant, which could at any time discharge plaintiff and those working with him. Plaintiff was no more an independent contractor than a mason would be who, subject to discharge at any time, lays bricks in a building at an agreed price for a thousand bricks, the bricks, mortar and an assistant being furnished to him, although he may work or not work, or work fast or slow, as he pleases.

As to the second proposition, involving as it does the question of the duty of defendant to furnish a safe place to work, and as to the third proposition, if in view of the plaintiff's position they are material, they (as we shall later on attempt to show) presented questions of fact for the jury. Independently of these propositions and certain objections to testimony which we think present no ground for a reversal of the judgment, it does not appear to be claimed that the case for plaintiff should not have been submitted to the jury. It is not now contended that the case submitted to the jury was not the case made by the plaintiff. There was no motion for a new trial. There

were requests, couched in the general form, that the evidence did not justify a verdict for the plaintiff, but the points made in argument are those which are considered above.

The declaration alleges, in a very general way, that what defendant omitted to do was to inspect and to timber the mine, or to prop and support the roof and walls thereof.   These are the essential averments of negligence. We do not find in the record any testimony tending to prove that the mine required timbering or the walls or roof thereof support, or that either precaution was practicable.   Besides, plaintiff knew that the mine was not timbered; at least, such knowledge might have been inferred by the jury.   What the testimony does tend to prove is that the particular rock or stone which fell was loose, was liable to be jarred or thrown down, and that the mine boss knew it was loose, had been propped or supported in the coal mine, and the prop or props removed in making the shale mine.   It does not appear that in any other place the roof or walls required support or that in any other respect the mine was unsafe except as all underground workings may be said to be unsafe.   The drift had been opened beyond the point where the rock overhung it before plaintiff began work.   It is to be inferred from the testimony that this rock could have been, and should have been, broken down and removed.   There is no testimony tending to prove, and the court cannot take judicial notice of the fact, that general inspection of the mine was necessary.

It is therefore evident that the material questions for the jury were (1) whether the particular condition created by the loose rock and the successive explosions rendered the place unsafe, and whether ordinary care demanded that the rock be removed or be supported in place; (2) whether, if it was negligent to leave the rock in place unsupported, it was the negligence of defendant; (3) whether plaintiff was negligent.   The testimony which

was produced made a case very different from the one considered in *Petaja* v. *Mining Co.*, 106 Mich. 463 (64 N. W. 335, 66 N. W. 951, 32 L. R. A. 435, 58 Am. St. Rep. 505), or the one considered in *Beesley* v. *F. W. Wheeler & Co.*, 103 Mich. 196 (61 N. W. 658, 27 L. R. A. 266). The drift, at the point where plaintiff was injured, was a permanent passageway, in which plaintiff found rails laid to a point many feet beyond the point where he was injured. So far as appears, it was a safe one except for the loose overhanging rock. Indeed, the work of plaintiff and his fellows did not create the roof of the drift.

We are of opinion that the testimony tending to prove, as a part of the contract of hiring, the assurance that the mine was a safe place, testimony which was afterwards stricken out, and that tending to prove that plaintiff had no experience in mining, was inadmissible, under the declaration, to show the negligence of defendant, but we hold that its admission did not prejudice defendant. It did not prejudice defendant because, as has been stated, there was no question of the safety of the mine except as connected with the hanging rock, and none of the experience of plaintiff except as affecting his duty to discover the only danger which existed.

Plaintiff introduced some testimony tending to prove that it was a custom, not always observed, for Peake, after an explosion, to go into the drift ahead of the others and look the walls and roof over, and then call the others, and that upon the particular occasion he went into the drift and was followed by plaintiff and the others before they were called. Upon this testimony, and it was not all one way, nor was it very certain, defendant based, in part, the theory of plaintiff's contributory negligence and submitted a request. Upon this subject the court gave the following instruction, which, while not very specific, we regard as favorable to defendant.

"This is the defendant's seventh request:

" 'And if the jury find from the evidence in this case that the plaintiff knew it was his duty to remain away after a shot was fired until Mr. Peake should examine the walls and roof, and ascertain whether there was loose rock liable to fall, and if the jury further find from the evidence that at the time of the firing of the last shot before the injury to plaintiff, the plaintiff and all those working with him including Mr. Peake went out of the mine, and that after the explosion Peake said, "Come on; let's go down and see what we have got," or in any other way told the men to go with him down the shaft, and you find that the plaintiff knew that Peake went with him down the shaft, and that the plaintiff knew that Peake had not yet examined the walls or roof of the drift in the vicinity of where the shot was fired, and the plaintiff, in spite of such knowledge, with desire to get to work that he might earn more money, began working before Mr. Peake pronounced it safe or said anything to him, the plaintiff, about beginning work in the end of the drift or about the subject of whether there was loose rock or about whether it was safe, then the plaintiff was guilty of contributory negligence, and if you so find your verdict must be for the defendant.'

" Now, that depends very much upon what you find that the plaintiff knew was the duty of Mr. Peake and what he knew was his duty at the time. If he knew at that time that it was Mr. Peake's duty before he resumed the work, or before he came near his work, that it was Mr. Peake's duty to go and investigate and if at that time when the accident happened, Mr. Peake had not made such investigation and had not signified to the plaintiff in any way that it was his duty to go to work, then the plaintiff should have waited longer, and if you find this to be the fact, then plaintiff could not recover. You have a right to take into consideration where Mr. Peake was at the time and where the plaintiff was at the time. As I understand the evidence, and it is your duty to determine that fact, at the time of the accident, Mr. Peake was up toward the top where the explosion occurred, and the plaintiff was back here, some of the witnesses said, 20 or 30 feet back. Now, you should take into consideration all of those facts, what occurred between Mr. Peake and this man at the top of the mine, what Mr. Peake said to the plaintiff, or those who were with the plaintiff, and determine whether or not the plaintiff at that time violated any duty which he owed the company. If he violated any duty which in any way contributed to the injury in this case, then he could not recover. Or, in other words,

if he violated any duty that he owed to the defendant, he was guilty of contributory negligence, and if that negligence contributed in any way to the injury, then the plaintiff could not recover."

This was favorable to defendant because there is no testimony tending to prove that it was the custom for Peake to examine the roof in the whole drift after each explosion or any considerable portion of it except at or near the point where the shot was fired. In other portions of the charge the jury was told that if plaintiff knew of the loose rock, or by reasonable care could have discovered its condition, he could not recover; that plaintiff assumed the usual hazards of the employment, but had a right to rely upon the performance by the master of his duty to furnish a reasonably safe place in which to work. He instructed them also:

" If the jury find from the evidence that the rock which fell upon plaintiff was caused to fall by the blasts which the plaintiff and those working with him, placed in the west entry and fired during the time plaintiff was working there, then the plaintiff cannot recover, and your verdict, if you so find, should be not guilty. I will amend that by saying, unless you find that the rock had been loose such a length of time and the defendant knew it, and that by the exercise of ordinary and reasonable diligence, it should have removed it."

There was abundant testimony to support findings that as to his knowledge of the condition of the roof—the dangerous condition created by the loose rock—Peake was not a fellow-servant of plaintiff and that if the proper officers of defendant had no actual knowledge of the particular condition of the roof of this drift, they were legally chargeable with such notice.

The rulings made by the court during the cross-examination of plaintiff evidence no abuse of discretion. The instructions upon the subject of the damages recoverable by plaintiff are criticised by counsel. Defendant presented no request and asked for no correction of the charge. It is not claimed that the verdict, the amount of which

does not appear in the record, was excessive. The instructions might have been amplified, but their general nature, so long as the rule stated is a correct one, does not justify a reversal of the judgment. A proper rule was stated, and there was some testimony concerning the wages plaintiff was capable of earning and had earned. In view of all of the testimony and of the considerations which have been stated, we are of the opinion that the failure on the part of the court to more sharply and simply present to the jury the precise questions of fact which were involved is not a good ground for reversing the judgment. The specific objections made by the appellant cannot be sustained. Affirmance of the judgment does not imply approval of all that was done at the trial or of all that was said to the jury. The testimony for plaintiff tended to prove the negligence of defendant in not removing the rock or supporting it in the roof of the mine and absence of negligence on the part of plaintiff. That plaintiff was severely injured, there can be no doubt.

The judgment is affirmed.

BIRD, BLAIR, HOOKER, and STONE, JJ., concurred.